IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 16-00453 SOM |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING MOTION TO** |
| | ) | **SUPPRESS NO. 1 (FOURTH** |
| vs. | ) | **AMENDMENT) AND MOTION TO** |
| | ) | **SUPPRESS NO. 2 (FIFTH** |
| SHERI LEE PUALANI KAPAHU, | ) | **AMENDMENT)** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS NO. 1 (FOURTH AMENDMENT) AND MOTION TO SUPPRESS NO. 2 (FIFTH AMENDMENT)**

I.      INTRODUCTION.

Before the court are two motions to suppress by Defendant Sheri Lee Pualani Kapahu.

In Motion No. 1, Kapahu seeks suppression of all items seized from her purse, and any fruits of that seizure.  Kapahu argues that this evidence was obtained by a "warrantless, non-consensual, and unconstitutional search" after "the [G]overnment's failure to honor her express and unambiguous refusal to consent to a search of herself and her purse."  Kapahu's Motion to Suppress No. 1, ECF No. 17, PageID #s 32-33.

In Motion No. 2, Kapahu seeks suppression of all statements she made after she was "confronted with evidence and knowledge of her guilt."  Kapahu's Motion to Suppress No. 2, ECF No. 18, PageID # 49.  She contends that, although law enforcement officers were required to provide Miranda warnings,

1

they failed to do so.  See id.  Kapahu contends that the primary

issue on this second motion to suppress is whether she was in

custody during her encounter with the officers.[1]  See id.

Because the Government has demonstrated by a

preponderance of the evidence that Kapahu was not in custody

until after she had confessed to having drugs in her purse, the

motion to suppress her statements is denied.  The motion to

suppress items seized from her purse, and all fruits of that

seizure, is also denied.

II.      FINDINGS OF FACT.

This court received oral testimony from Special Agent

Richard Jones during a hearing on September 12, 2016.  The court

also had before it Special Agent Jones's Report of Investigation

and a copy of Kapahu's boarding pass.  In an effort to rule

promptly on the merits and to avoid the burden on the court's

over-extended court reporters, and because both motions to

suppress were filed right before what was then the trial date,

the court did not request and therefore does not have final

transcripts of the live testimony, although the court has

"rough" unedited copies of those transcripts.  Therefore, in

referring to that testimony in these findings of fact, this

---

[1]      As requested by Kapahu, the court finds that the
timing of the Government's provision of discovery is good cause
for Kapahu's filing of her motions to suppress after the motions
cutoff.

court is unable to give exact page and line citations to the testimony.

Based on the live testimony and the record, the court makes the following findings of fact based on a preponderance of the evidence.  The findings are identified by letters of the alphabet for ease of reference in future proceedings.  Unless otherwise indicated, the findings of fact are based on Agent Jones's testimony.

A.    Agent Jones has been with the Drug Enforcement Administration since 1998 and has been working with the interdiction group of the Honolulu Airport Task Force since 2002, except for a period from 2007 to 2008 when he was assigned to another DEA group.  This court found him to be credible.

B.    On June 28, 2016, at about 8:00 p.m., Honolulu Airport Task Force Officer Lovinna Kaniho called Agent Jones at home about a tip from the Kauai Police Department.  According to the tip, Kapahu might be flying from Honolulu to Lihue, Kauai, on a Hawaiian Airlines flight set to leave at around 10:00 p.m. that evening.  Kapahu reportedly might be carrying methamphetamine.  See also Special Agent Richard Jones's Report of Investigation, ECF No. 17-1, PageID # 45.

C.    Agent Jones left his house to go to the airport shortly after getting the call, dressed in a t-shirt or tank top, shorts, and slippers.

D.   On the way to or at the airport, Agent Jones called Sergeant Danny Oliveira at the Kauai Police Department for more information.  Sergeant Oliveira told Agent Jones that the tip had been provided by an informant who had no past history of providing reliable information.  Sergeant Oliveira said that Kapahu had a minor criminal history and sent Agent Jones (presumably electronically) a copy of Kapahu's driver's license photograph.  Sergeant Oliveira confirmed that Kapahu was suspected of transporting drugs and was on a flight to Lihue scheduled to leave Honolulu at around 10:00 p.m.

E.   Agent Jones arrived at Honolulu International Airport around 8:45 p.m.  Noting that Hawaiian Airlines flight 323 bound for Lihue was scheduled to depart at 9:35 p.m. from Gate 58, he went to Gate 58.  See also id.  He saw Kapahu seated in the waiting area between Gate 58 and Gate 59, but he decided to wait for Officer Kaniho to arrive before approaching Kapahu.

F.   Officer Kaniho arrived within a few minutes, dressed in a t-shirt (and possibly also a flannel shirt) and jeans.  Agent Jones and Officer Kaniho went up to Kapahu, who by then was standing at the end of the boarding line at Gate 58.  Agent Jones showed Kapahu his law enforcement credentials.

G.   Agent Jones stood to the side of Kapahu while Officer Kaniho stood slightly behind her, just outside of Kapahu's peripheral vision.  See also id.  Neither Agent Jones

4

nor Officer Kaniho displayed any weapon or drew any firearm during the encounter.

H.   Agent Jones did all the questioning.  He told Kapahu his name and said that he worked for the police department at the airport.  He told Kapahu that she was not under arrest, was not in trouble, and was free to leave at any time.  He asked Kapahu if he could speak with her, and Kapahu agreed.  Agent Jones then asked Kapahu if she was on the flight headed for Lihue, and she said that she was.  Agent Jones asked Kapahu for her boarding pass and identification.  With her hands shaking a bit, Kapahu handed him her boarding pass for Hawaiian Airlines flight 323 and a card that appeared to be a hotel room key.  Agent Jones handed the card back to Kapahu, who then handed him her driver's license.  Agent Jones gave the boarding pass and driver's license to Officer Kaniho to photograph while Agent Jones asked Kapahu about the nature of her trip.  When Officer Kaniho handed the materials back to Agent Jones, he returned them to Kapahu.

I.   Kapahu told Agent Jones that she had come to Oahu to visit her brother "in rehab" for "ice."  Agent Jones asked Kapahu when she had arrived on Oahu, and Kapahu stated that she had arrived the day before.  Asked where she had stayed on Oahu, Kapahu replied that she had stayed at a hotel, the name of which she said she could not recall.  Kapahu appeared nervous to Agent

Jones while answering these questions.  Agent Jones asked Kapahu whether anyone had asked her to transport anything back to Kauai.  Kapahu replied "no."  Agent Jones then asked whether Kapahu was transporting any drugs back to Kauai, and Kapahu again responded "no."

       J.  Agent Jones, suspecting that Kapahu was lying, asked her if she would consent to his searching her person and purse to ensure that she did not have any drugs.  Kapahu asked Agent Jones, "Don't you need a warrant for that?"  Agent Jones responded that he was "just asking."  Agent Jones repeated that the encounter was consensual, that it was up to her, and that she could agree or disagree.  Kapahu hesitated, and then, in what Agent Jones described as a "slow drawn out" voice, said "I'd rather you didn't."  Agent Jones told Kapahu he understood because he himself did not like people going through his things. He then asked Kapahu if she thought that law enforcement officers walked around the airport dressed the way he was dressed and just randomly went up to people to talk.  He said that he already knew that she was transporting drugs[2] and that he needed her help to catch the people she was going to give the

---

[2]  Although Agent Jones testified in court that he told Kapahu he knew she had drugs, his Report of Investigation says he told her he knew she was transporting "something."  ECF No. 17-1, PageID # 46.

drugs to on Kauai.  This was a bluff; Agent Jones suspected that Kapahu was carrying drugs, but did not actually know if she was.

K.   Kapahu remained standing in line to board the flight to Lihue and made no movement away from the boarding line.  However, she put her hands over her face and said, "I want to go home."  This reaction confirmed for Agent Jones the high possibility that Kapahu was carrying drugs.  In Agent Jones's mind, Kapahu's reaction was sufficient to support detaining Kapahu long enough to allow a drug-sniffing dog to arrive and for Agent Jones to see if the dog "alerted" on Kapahu or on whatever she was carrying.  This would have been what Agent Jones referred to as a "temporary detention."  Had a dog sniff occurred without an "alert," Kapahu would have been allowed to leave.  However, Agent Jones did not tell Kapahu what he thought, that a dog was on the way, or that she was no longer free to leave.  What occurred next mooted out any dog sniff, and no dog sniff occurred.

L.   Agent Jones asked Kapahu where the drugs were, and Kapahu told him that they were in her purse.  He asked Kapahu how much was in her purse, and she stated five ounces. He asked Kapahu, "Five ounces of what?"  She replied, "Ice," referring to crystal methamphetamine.  See also ECF No. 17-1, PageID #s 43-44, 46.  Agent Jones then believed that he had probable cause to arrest her.

7

M.   Agent Jones told Kapahu again that he needed her assistance to catch the people from whom she had received the drugs and to whom she planned to give the drugs.  So that bystanders would not overhear what followed, he asked Kapahu to move from the boarding line to sit in some chairs facing the windows between Gate 57 and Gate 58.  Kapahu complied, stepping out of the line and following Agent Jones and Officer Kaniho to the chairs.

N.   Agent Jones told Kapahu that they wanted her cooperation.  Kapahu asked if she could go home.  Agent Jones told Kapahu that he did not know what would happen that evening and that whether she could go home depended on her cooperation.

O.   Neither officer told Kapahu that she was under arrest or that she was no longer free to leave.  She did not attempt to leave.  She appeared cooperative, was not handcuffed, and was not physically dragged or ordered to move out of the boarding line to sit in the chairs.

P.   Agent Jones asked Kapahu if Officer Kaniho could retrieve the drugs from her purse.  Kapahu replied "yes," and Officer Kaniho removed what appeared to be drugs from Kapahu's purse.

Q.   The entire encounter from the time the officers first approached Kapahu until the time they retrieved the drugs from her purse lasted less than eight minutes.  The officers

8

handcuffed Kapahu before transporting her to the Honolulu
Airport Task Force office.  Special Agent Frank Bru, dressed in
a t-shirt and either shorts or long pants, joined Agent Jones
and Officer Kaniho at the exit near the Hawaiian Airlines
ticketing area.  According to Agent Jones's Report of
Investigation, at the Honolulu Task Force office, Agent Bru
tested what had been retrieved from Kapahu's purse, and the
material tested positive for the presence of methamphetamine.
See id., PageID #s 43-44.

R.   Agent Jones's Report of Investigation states
that, at the office, Kapahu initially gave oral permission to
search her phone and provided the code to access her phone, but
she revoked her consent after reviewing the written consent to
search form.  See id.  Agent Jones read Miranda warnings to her
at the office, and Kapahu invoked her right to counsel and asked
to speak with an attorney.

III.   CONCLUSIONS OF LAW.

A.   **Kapahu Was Not in Custody Until She Moved from
the Boarding Line to the Chairs.**

1.   Kapahu tracks the numerical order in the
Bill of Rights in calling her Fourth Amendment motion "Motion to
Suppress No. 1" and her Fifth Amendment motion "Motion to
Suppress No. 2."  This court, however, addresses the Fifth
Amendment issue first because the Fifth Amendment issue concerns

events that occurred before the events implicating the Fourth Amendment.  As the parties agree, the motion to suppress statements turns on whether Kapahu's Fifth Amendment <u>Miranda</u> rights were violated.  <u>See</u> Kapahu's Motion to Suppress No. 2, ECF No. 18, PageID #s 48-49 ("The Fifth Amendment <u>Miranda</u> issue this case presents is whether the defendant's statements after being confronted with evidence and knowledge of her guilt are inadmissible because agents failed to provide <u>Miranda</u> warnings and did not obtain a <u>Miranda</u> waiver."); Government's Opposition to Kapahu's Two Motions to Suppress, ECF No. 24, PageID # 69.

2.   In <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966), the Supreme Court held that a person in custody is entitled to procedural safeguards before being questioned.  In the absence of such safeguards, the prosecution may not use what it learns through its interrogation.  <u>Id.</u>  This holding was premised on the Fifth Amendment's privilege against self-incrimination, which the Supreme Court reasoned is protected when a person is adequately and effectively advised of his or her rights.  <u>See</u> <u>id.</u> at 467.

3.   <u>Miranda</u> warnings specifically advise a person in custody that she has a right to remain silent, that anything she says may be used against her in court, that she has the right to an attorney before and during questioning, and that

an attorney will be appointed if she cannot afford one.   See id.
at 479.

4.   "An officer's obligation to give a suspect
Miranda warnings before interrogation extends only to those
instances where the individual is 'in custody.'"   United States
v. Kim, 292 F.3d 969, 973 (9th Cir. 2002).   In determining
whether an individual is in custody, a court must examine the
objective circumstances surrounding the interrogation and decide
"whether there [was] a formal arrest or restraint on freedom of
movement of the degree associated with a formal arrest."   Id.
(quoting Stansbury v. California, 511 U.S. 318, 322 (1994)).

5.   The inquiry into whether an individual is in
custody does not focus on the subjective views of the agents or
of the individual being questioned, but rather on whether "the
officers established a setting from which a reasonable person
would believe that he or she was not free to leave."   Id. at
973-74 (quoting United States v. Beraun-Panez, 812 F.2d 578, 580
(9th Cir. 1987)).

6.   The Ninth Circuit has identified the
following factors as relevant to whether an individual is in
custody for Fifth Amendment purposes:

> (1) the language used to summon the individual;
> (2) the extent to which the defendant is
> confronted with evidence of guilt; (3) the
> physical surroundings of the interrogation; (4)

the duration of the detention; and (5) the degree
of pressure applied to detain the individual.

Id. at 974 (quoting United States v. Hayden, 260 F.3d 1062, 1066
(9th Cir. 2001)).  These factors are not dispositive of the
ultimate determination of whether an individual is in custody,
but they address circumstances that frequently arise.  Id.

7.    This court turns to the first factor (the
language used to summon Kapahu).  Agent Jones and Officer Kaniho
first began the encounter with Kapahu in the airport terminal at
the departure gate.  Before beginning to question Kapahu, Agent
Jones told her that she was not under arrest, was not in
trouble, and was free to leave at any time.  Agent Jones asked
if he could speak with Kapahu, and she agreed to speak with him.
See id. (referring to cases holding that "suspects were not in
custody where the circumstances included volunteering to answer
law officers' questions").  There is no evidence that the
officers' language was coercive or threatening.  It was only
after Kapahu told the officers that she had five ounces of "ice"
in her purse that they directed her to move out of the boarding
line in a manner that would have led a reasonable person who had
just confessed to a crime to think that she was no longer free
to leave.

8.    The second factor going to whether a person
is in custody concerns the extent to which the defendant is

12

confronted with evidence of guilt.  Agent Jones did not immediately confront Kapahu with any evidence of guilt.  He asked her if she was carrying drugs, then claimed (falsely) to know that she was.  Clearly, in making this claim, he was confronting Kapahu with purported evidence of guilt.  The extent of the confrontation was limited in time but purported to be definite in nature.

9.    The third factor examines the physical surroundings of the interrogation.  Agent Jones questioned Kapahu in the public setting of the airport terminal near the departure gate.  Kapahu was standing at the end of the boarding line.  Agent Jones stood to Kapahu's side while he questioned her; Officer Kaniho stood behind Kapahu just outside of her peripheral vision.  Thus, Kapahu was in a public setting with other uninvolved people around her until she confessed to having five ounces of methamphetamine, at which point the officers asked her to move out of the boarding line to sit in some chairs.  Kapahu was not questioned in the confines of a private room or at a police station until she was transported to the Honolulu Airport Task Force Office.  Agent Jones was not in uniform while questioning her.  He was dressed casually and never displayed a weapon.  Kapahu's physical surroundings did not suggest custody until, at the earliest, after she had already confessed.

10.   The fourth factor concerns the duration of any "detention" near Gate 58.  Even assuming Kapahu was "detained" while in the boarding line, Agent Jones testified that the encounter lasted about eight minutes from start to finish.  The duration of the encounter thus did not indicate that Kapahu was in custody at the time she confessed.

11.   The fifth factor goes to the degree of pressure applied to detain Kapahu.  Agent Jones and Officer Kaniho did not force Kapahu to speak with them.  She may have been concerned about getting on the plane, but that was not pressure applied by the officers.  Nothing beyond what has been discussed with respect to the preceding factors constituted the application of pressure by law enforcement.  See, e.g., United States v. Gregory, 891 F.2d 732, 735 (9th Cir. 1989) (affirming denial of motion to suppress when defendant "consented to be interviewed in his house, he was interviewed in the presence of his wife, the interview lasted only a brief time, and no coercion or force was used"); United States v. Hudgens, 798 F.2d 1234, 1236-37 (9th Cir. 1986) (affirming denial of motion to suppress when defendant voluntarily entered police car to talk to police, agents did not use intimidating language during encounter, and defendant testified that he did not feel coerced by agents).  No one yelled at Kapahu or manhandled her or

14

threatened her.  No arrest occurred until Kapahu had made the statements she seeks to suppress.

12.   Before and at the time Kapahu confessed while standing in the boarding line, four of the factors analyzed above weigh in favor of a determination that she was not in custody.  The initial language Agent Jones used included the clear statement that Kapahu was free to refuse to talk to Agent Jones; she was questioned in a public area where she was voluntarily standing along with other people; her encounter with law enforcement lasted only eight minutes (some of which involved matters in the seating area rather than in the boarding line); and there was no pressure applied outside of confronting her with alleged knowledge of her guilt.  That accusation of guilt is the only factor weighing in favor of a determination that she was in custody.

13.   This court understands that the custody determination does not require giving equal weight to every factor, and that a person may be in custody even if more factors suggest a lack of custody.  However, in the present case, the accusation was brief and undetailed, and is outweighed by the other factors.  See, e.g., Gregory, 891 F.2d at 735; Hudgens, 798 F.2d at 1237-38.  A reasonable person in Kapahu's position would not have believed that she was in custody at the time she confessed.  Because her confession to having five ounces of ice

15

in her purse and the statements before her confession were made while a reasonable person in her position would not have thought she was in custody, Miranda warnings were not required before her confession.  Statements up to and including her confession are not suppressed.

14.  This court recognizes that, even before Kapahu confessed, Agent Jones had intended to at least temporarily detain Kapahu when she put her hands over her face. However, a law enforcement officer's "unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time."  Berkemer v. McCarty, 468 U.S. 420, 441 (1984).  Instead, the relevant inquiry is what a reasonable person in Kapahu's position would have thought.  Id. at 422. Because Agent Jones said or did nothing at that point to contradict his earlier statement that Kapahu was free to leave, a reasonable person would not have thought she was being detained at that point, regardless of what Agent Jones intended. It was not until later, when Kapahu confessed and was directed to leave the boarding line, that custody began.

15.  This court turns to what Kapahu said after moving out of the boarding line.  Once Kapahu was asked to move out of the boarding line, a reasonable person would have thought she was indeed in custody.  The only evidence in the record of any discussion between the time Kapahu was asked to leave the

boarding line and the discussion at the office concerning her
cell phone involves Agent Jones's question to Kapahu asking if
Officer Kaniho could retrieve the drugs from Kapahu's purse.
Kapahu had already confessed to having five ounces of
methamphetamine in her purse.  Kapahu replied "yes," and Officer
Kaniho took the drugs from Kapahu's purse.  Miranda applies only
to a "custodial interrogation" of a defendant.  Miranda, 384
U.S. at 444.  This court concludes that, although Kapahu was in
custody when Agent Jones asked whether Officer Kaniho could
retrieve the drugs from Kapahu's purse, that question was not an
interrogation required to be preceded by Miranda warnings.

        16.  In Rhode Island v. Innis, 446 U.S. 291, 301
(1980), the Supreme Court defined "interrogation" to include
"any words or actions on the part of the police (other than
those normally attendant to arrest and custody) that the police
should know are reasonably likely to elicit an incriminating
response from the suspect."  The Ninth Circuit has observed that
"[a] consent to a search is not the type of incriminating
statement toward which the fifth amendment is directed."  United
States v. Lemon, 550 F.2d 467, 472 (9th Cir. 1977).  Giving
consent to search "is not in itself 'evidence of a testimonial
or communicative nature.'"  Id. (citing Schmerber v. California,
384 U.S. 757, 761-64 (1966)); see also United States v. Henley,
984 F.2d 1040, 1042 (9th Cir. 1993) ("The mere act of consenting

17

to a search—'Yes, you may search my car'—does not incriminate a defendant, even though the derivative evidence uncovered may itself be highly incriminating."). Thus, Kapahu's response to Agent Jones's request that Officer Kaniho be allowed to retrieve the drugs was not part of any interrogation. See United States v. Knope, 655 F.3d 647, 654 (7th Cir. 2011) (noting that consent to search is not interrogation under Miranda).

17. As the Ninth Circuit recognized in United States v. Booth, 669 F.2d 1231, 1237 (9th Cir. 1981), "not every question is an interrogation. Many sorts of questions do not, by their very nature, involve the psychological intimidation that Miranda is designed to prevent." There is "no basis for the suggestion that a request to search must be preceded by Miranda warnings, or that the lack of prior Miranda warnings vitiates a consent to search." United States v. Ritter, 752 F.2d 435, 438 (9th Cir. 1985). It is not clear from Kapahu's motion that she is seeking to suppress her affirmative response to Agent Jones's question about whether Officer Kaniho could retrieve the drugs, but, if Kapahu is seeking suppression of that response, suppression is denied.

18. Similarly, the record does not include any indication that Kapahu was "interrogated" while at the Honolulu Airport Task Force office. She reportedly was asked for her cell phone passcode but rescinded her initial consent after

18

reviewing the consent to search form.  This court views the request for the passcode as being in the same vein as the request to retrieve the drugs from her purse, i.e., as not constituting an interrogation.  After that, Miranda rights were given, and Kapahu asked for an attorney.  None of what happened at the office constituted an interrogation, and so the discussion at the office is not suppressed.

19.  Kapahu was not in custody before or at the time she confessed, and, although in custody when she consented to the seizure of drugs from her purse, was not then being interrogated.  Miranda did not apply to any of her statements at the airport or to anything said at the office.  Accordingly, Kapahu's motion to suppress statements based on an alleged violation of the Fifth Amendment is denied.

20.  The court is not overlooking Kapahu's argument that Agent Jones violated the Fifth Amendment by not ending his questions the first time Kapahu said, "I want to go home."  Kapahu made this statement when she put her hands over her face, before she confessed.  Kapahu says that Agent Jones was required to end the discussion at that point, because the encounter was supposed to be consensual.  Kapahu does not cite authorities to that effect that are applicable here.  This court identifies relevant circumstances making Kapahu's argument unpersuasive.

21.   First, "I want to go home" is not a clear revocation of Kapahu's earlier agreement to talk with Agent Jones.   While the present discussion concerns Fifth Amendment rights, this court notes that, in the Fourth Amendment context, the law requires that a revocation of consent to search must be clear and unequivocal.   See, e.g., United States v. Brown, 884 F.2d 1309, 1312 (9th Cir. 1989) (concluding that defendant's mere reluctance to allow search to continue is not sufficient to indicate defendant "had withdrawn his unambiguous statement of consent"); see also United States v. Gray, 369 F.3d 1024, 1026 (8th Cir. 2004) ("Withdrawal of consent need not be effectuated through particular 'magic words,' but an intent to withdraw consent must be made by unequivocal act or statement.").   It is not clear to this court that lesser clarity is required under the Fifth Amendment with a revocation of consent to answer questions, especially because a refusal to answer questions is entirely in the speaker's control.   By contrast, a person who revokes consent to search must depend to some degree on the person about to conduct a search.

22.   Second, having been told that she could leave, Kapahu stayed in the boarding line and continued to talk to Agent Jones.   This behavior is not consistent with a refusal to continue to answer questions.

23.   Third, Agent Jones by then had a reasonable suspicion that Kapahu had drugs on her under Terry v. Ohio, 392 U.S. 1 (1968), and so could have briefly detained her even without her consent.   See United States v. Sokolow, 490 U.S. 1, 7 (1989) (requiring only "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'" for Terry stop).   The tip from the Kauai Police Department that Kapahu was carrying drugs, although not sufficient for a Terry stop on its own, rose to a reasonable suspicion when Agent Jones observed Kapahu's nervousness (e.g., shaking hands, handing over a hotel room card instead of her driver's license) and when he saw her reaction to his assertion that he knew she was carrying drugs.   In short, Kapahu's statement that she wanted to go home does not support suppression of her statements.

### B.   The Search of Kapahu's Purse and Seizure of the Drugs Was Constitutional.

1.   Kapahu seeks suppression of items seized from her purse, arguing that the warrantless seizure violated her Fourth Amendment rights.

2.   The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." United States v. Place, 462 U.S. 696, 700 (1983).   A search that is "conducted without a warrant issued upon probable cause is 'per

se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). A search conducted pursuant to consent is a specifically established exception to the warrant and probable cause requirements. Id. The Government contends that it did not need a warrant because it had Kapahu's consent.

3. When the Government relies on the consent exception, the Government bears the burden of proving that it had consent and that the consent was freely and voluntarily given. United States v. Patayan Soriano, 361 F.3d 494, 501 (9th Cir. 2003). Consent that is voluntary cannot be "the result of duress or coercion, express or implied." Schneckloth, 389 U.S. at 248. Whether consent was voluntarily given is a question of fact to be determined in light of the totality of the circumstances. Id. at 248-49.

4. The Ninth Circuit has articulated five factors to be considered in determining the voluntariness of consent in this context:

> (1) whether the [consenting individual] was in
> custody; (2) whether the arresting officers had
> their guns drawn; (3) whether Miranda warnings
> were given; (4) whether the [consenting
> individual] was notified that she had a right not
> to consent; and (5) whether the [consenting

> individual] had been told a search warrant could
> be obtained.

United States v. Brown, 563 F.3d 410, 415 (9th Cir. 2009)

(quoting United States v. Jones, 286 F.3d 1146, 1152 (9th Cir.

2002)).  "These factors serve merely as guideposts, 'not [as] a

mechanized formula to resolve the voluntariness inquiry.'"  Id.

(quoting Patayan Soriano, 361 F.3d at 502).  No one factor is

determinative, and a court may review other relevant facts in

determining whether the defendant's consent was voluntary.  See

Patayan Soriano, 361 F.3d at 502-07 (reviewing five customary

factors as well as whether law enforcement officers

impermissibly threatened defendant).

      5.   As to the first factor, a person is in

custody when, "taking into account all of the circumstances

surrounding the encounter, the police conduct would have

communicated to a reasonable person that he was not at liberty

to ignore the police presence and go about his business."

Brown, 563 F.3d at 415 (quoting United States v. Washington, 387

F.3d 1060, 1068 (9th Cir. 2004)); see also Berkemer, 468 U.S. at

440 (observing that person is considered in custody when

person's freedom to move is curtailed to similar degree as with

formal arrest).

      6.   With respect to the determination of whether

a person is in custody for Fourth Amendment purposes, the Ninth

Circuit has articulated yet another set of five factors. Some
of these five factors echo factors listed for determining
consent under the Fourth Amendment or factors listed for
determining custody under the Fifth Amendment. The five
identified factors are:

> (1) the number of officers; (2) whether weapons
> were displayed; (3) whether the encounter
> occurred in a public or non-public setting; (4)
> whether the officer's officious or authoritative
> manner would imply that compliance would be
> compelled; and (5) whether the officers advised
> the detainee of his right to terminate the
> encounter.

Brown, 563 F.3d at 415 (quoting Washington, 387 F.3d at 1068).
A court must decide whether, in light of the totality of the
circumstances, a reasonable person in the defendant's position
"would have felt deprived of his freedom of action in any
significant way, such that he would not have felt free to
terminate the interrogation." United States v. Craighead, 539
F.3d 1073, 1082 (9th Cir. 2008).

7. Kapahu was clearly in custody when Agent
Jones asked for consent to search her purse. This court
recognizes that only two officers were present, neither officer
had a weapon visible or drawn, and consent was sought in a
public place. However, after obtaining a confession from
Kapahu, Agent Jones had acted authoritatively in asking her to
get out of the boarding line. Agent Jones was not at that point

behaving as if his earlier statement that Kapahu could leave was
still in effect.  Of course, being in custody is not "enough in
itself to demonstrate a coerced . . . consent to search."  See
United States v. Watson, 423 U.S. 411, 424 (1976); see also
United States v. Castillo, 866 F.2d 1071, 1082 (9th Cir. 1988)
(collecting cases noting that arrest and absence of Miranda
warnings are not dispositive of whether consent was voluntary).
The court therefore turns to the other factors the Ninth Circuit
has identified as relevant to whether a person has voluntarily
consented to a search.

8.   The second consent factor concerns whether
officers had their weapons visible or drawn.  As this court has
already stated earlier in this order, no weapon was visible or
drawn.

9.   The third consent factor looks at whether
Miranda warnings were given.  Kapahu was not read her Miranda
rights before Agent Jones asked for her consent to retrieve the
drugs from her purse.  But Miranda warnings were not required,
because, although Kapahu was in custody, she was not being
interrogated when she was asked for consent to retrieve the
drugs.

10.  The fourth factor goes to whether Kapahu was
told that she could refuse to consent to a search of her purse.
Although Agent Jones had earlier told Kapahu that consent was up

to her, and Kapahu had earlier declined to let Agent Jones search her purse, circumstances had clearly changed by the time Kapahu had moved out of the boarding line.  Agent Jones did not tell Kapahu after moving her out of the boarding line that she could continue to withhold consent.  Kapahu was aware that Agent Jones had not overridden her earlier refusal, but it may well have been unclear to her whether she could still refuse after she confessed and was moved out of the boarding line.

11.  As to the fifth factor, the officers did not tell Kapahu that they could obtain a search warrant if she did not consent to a search.  In fact, it was Kapahu who had raised the need for a search warrant when initially asked for consent. Agent Jones had said at that time that he was "just asking." Kapahu contends that "just asking" was tantamount to a statement that no warrant was needed at that point.  This court does not think Kapahu's interpretation of "just asking" is necessarily correct.  "Just asking" could instead be viewed as indicating that Agent Jones was making a request, not requiring compliance. "Just asking" was not directly responsive to the question of whether a warrant was required.  In any event, neither "just asking" nor anything else Agent Jones said went to whether a warrant could be obtained.

12.  Two of the five consent factors (no weapons drawn and the lack of an assertion that officers could get a

warrant) weigh in favor of finding voluntary consent.  Two factors (Kapahu's custody status and the lack of clarification as to whether she could continue to withhold consent) weigh against finding voluntary consent.  Although Miranda warnings were not required, they certainly could have been given once Kapahu was in custody.  Under the circumstances of this case, this court treats the absence of Miranda warnings as a factor weighing against finding voluntary consent.  Because the five-factor inquiry is not dispositive, the court considers other relevant facts in determining whether Kapahu's consent was voluntary.  See Patayan Soriano, 361 F.3d at 502-07 (applying five factors and reviewing other facts to resolve involuntariness inquiry).

13.  A number of other circumstances suggest voluntary consent.  Kapahu was not handcuffed at the time she was in the seating area.  The very act of asking for consent to get the drugs from her purse gave her an opportunity to refuse.  In consenting, she may have wanted to display cooperation with law enforcement in the hope that it would redound to her benefit.

14.  Notwithstanding the circumstances indicating voluntary consent, this court is concerned that Kapahu just as easily could be said to have thought she had to consent in light of the confession she had already made.  In United States v.

Washington, the Ninth Circuit recognized the danger that a defendant's knowledge that law enforcement already had incriminating information might "give rise to a sense that refusing to consent would be futile."  387 F.3d at 1074.  As the Ninth Circuit put it in United States v. Furrow, refusing consent could be "a bit like closing the barn door after the horse is out."  229 F.3d 805, 814 (9th Cir. 2000), overruled on other grounds by United States v. Johnson, 256 F.3d 1064 (9th Cir. 2001).

      15.  Of course, Washington and Furrow involved requests for consent occurring after illegal actions by law enforcement.  By contrast, this court has already determined that there was no illegality preceding the request for consent to search Kapahu's purse while she was in the seating area. Still, whether what preceded a request for consent was legal or illegal is an after-the-fact determination by the court, not usually something a defendant knows or may comfortably rely on at the time of the request.  From a defendant's point of view at the time consent is requested, the same sense of futility could arise whether preceding events fall within or outside the law. Any sense of futility Kapahu might have had might have dissipated if she had been clearly told that, even after confessing, she remained free to refuse.  That did not occur.

16.   In summary, there are four circumstances giving this court pause with respect to whether Kapahu voluntarily consented to the search of her purse.  First, her confession may have caused her to view a refusal to consent as futile.  Second, there was no clarification provided to her as to whether she could refuse to consent even under the changed circumstances created by her confession.  This court is not here saying that a clarification was required by law, but it clearly would have been helpful.  Third, she was clearly in custody at the time consent was requested to retrieve the drugs.  Although she was not told she was under arrest, her circumstances were tantamount to an arrest.  Fourth, she had earlier declined consent and asked whether a warrant was needed.  That provides at least a suggestion that, in ultimately allowing the seizure in the absence of a warrant, she may have thought she was no longer free to refuse.

17.   Given the totality of the circumstances, this court hesitates to conclude that the Government has met its burden of proving that Kapahu voluntarily consented to the retrieval of the drugs from her purse.  The court's hesitation, however, does not cause this court to suppress the drug evidence.  Instead, without resolving the issue of consent to search, this court concludes that there is another ground on which the search and seizure were allowed.

29

18.   The Government asserts that, even if Kapahu did not voluntarily consent to the search of her purse, the warrantless search was justified because the officers had probable cause to arrest Kapahu and the search was "reasonably contemporaneous with an arrest based on that probable cause." ECF No. 24, PageID # 84.

19.   A search incident to lawful arrest is one of the "few specifically established and well-delineated exceptions" to the warrant requirement.  United States v. Maddox, 614 F.3d 1046, 1048 (9th Cir. 2010) (quoting Katz, 389 U.S. at 357).  Such a search is "conducted for the twin purposes of finding weapons the arrestee might use, or evidence the arrestee might conceal or destroy."  Id.

20.   The Ninth Circuit has held that even when a warrantless search occurs shortly before the suspect is arrested, the timing of the search is "immaterial" so long as there is probable cause to arrest.  Busby v. United States, 296 F.2d 328, 332 (9th Cir. 1961).  Probable cause to arrest exists when "facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed."  Beck v. Ohio, 379 U.S. 89, 96 (1964).  "As long as probable cause to arrest exists before the search, a search substantially contemporaneous with the arrest is incident thereto."  United States v. Chatman, 573 F.2d

30

565, 567 (9th Cir. 1977); see, e.g., United States v. Pope, 686 F.3d 1078, 1084 (9th Cir. 2012) (concluding that warrantless search was justified because law enforcement had probable cause to arrest defendant after defendant's confession of possessing drugs, evidence "would have been hidden or destroyed," and search was limited and "minimally intrusive").  Thus, the absence of a formal arrest of Kapahu before the drugs were retrieved from her purse does not prevent the search from having been incident to her arrest.

21.  Agent Jones had probable cause to arrest Kapahu once she confessed.  In determining the validity of a search incident to arrest, the Ninth Circuit asks, "(1) was the searched item 'within the arrestee's immediate control when he was arrested'; (2) did 'events occurring after the arrest but before the search ma[k]e the search unreasonable'?"  Maddox, 614 F.3d at 1048 (quoting United States v. Turner, 926 F.2d 883, 887 (9th Cir. 1991)).  If a warrantless search of luggage or other property seized at the time of arrest is "remote in time or place from the arrest" or if no exigency exists, then the search cannot be justified as incident to that arrest.  United States v. Chadwick, 433 U.S. 1, 15 (1977), overruled on other grounds by California v. Acevedo, 500 U.S. 565, 571 (1991).  Once law enforcement officers have exclusive control over the "luggage or other personal property not immediately associated with the

person of the arrestee," and "there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence," then a search of that property is not justified as incident to a lawful arrest.  Id.

22.  The drugs were in Kapahu's immediate control before being retrieved from her purse.  That is because at the time the officers retrieved the drugs, Kapahu appears to have been in control of her purse.  The purse was thus not in law enforcement's exclusive control.  The officers searched Kapahu's purse within a few minutes after Kapahu admitted to carrying five ounces of methamphetamine in her purse.  She was not handcuffed at the time, and, although in custody, she was not in a secure place.  Had the drugs not been retrieved, she could conceivably have removed them from her purse, tossed them aside or to someone else, or otherwise tampered with them.  Searching her purse to recover the drugs also allowed law enforcement agents to protect themselves by ensuring that Kapahu did not have a weapon in her purse.

23.  None of the events surrounding the seizure of the drugs renders the seizure unreasonable.  After Kapahu had confessed to carrying five ounces of methamphetamine in her purse, the officers asked her to move out of the boarding line to a more discreet location.  No physical force was used, and the scope of the search of Kapahu's purse and of the seizure of

32

the drugs was limited.  Agent Jones's Report of Investigation indicates that no nondrug evidence was seized, meaning that Kapahu's purse was not seized.

24.  The search of the purse and the seizure of drugs were incident to Kapahu's arrest.  Her purse and the drugs were not in law enforcement's exclusive control, and the search and the seizure were reasonable and limited.  No Fourth Amendment violation occurred.

**IV.       CONCLUSION.**

Both the Fifth Amendment and the Fourth Amendment motions to suppress are denied.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 5, 2016.



/s/ Susan Oki Mollway

Susan Oki Mollway
United States District Judge

United States v. Sheri Lee Pualani Kapahu, Crim. No. 16-00453 SOM; ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS NO. 1 (FOURTH AMENDMENT) AND MOTION TO SUPPRESS NO. 2 (FIFTH AMENDMENT)